J-A18045-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN THE INTEREST OF: G.J., A MINOR    :    IN THE SUPERIOR COURT OF
                                     :         PENNSYLVANIA
                                     :
APPEAL OF: B.B.                      :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :    No. 374 WDA 2020

Appeal from the Order Entered February 7, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02_AP-105-2019

BEFORE:  BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    FILED NOVEMBER 19, 2020

B.B. (Mother) appeals from the order granting the petition of the

Allegheny County Office of Children, Youth, and Families (CYF) to involuntarily

terminate her parental rights to G.J. (Child), born in December 2015, pursuant

to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  We affirm.

The trial court set forth the relevant background as follows:

Child was born . . . to [Mother] and an unknown father.[1]  Mother
had prior history with [CYF], primarily due to [M]other's mental
health.  Mother, herself was an adjudicated dependent child.
Additionally, Mother's rights to an older child were involuntarily
terminated [in 2015], and that child was adopted.  [Child] came
to the attention of CYF after Mother was involved in an incident

_____

[1] The trial court also involuntarily terminated the parental rights of "E.
Unknown," and any unknown father of Child.  We note that Mother's paramour
at the time, M.J., was listed as Child's putative father in several dependency
orders and family service plans (FSP) from 2017 to 2019, although there was
no indication that M.J. was Child's biological father.  Mother and M.J.
apparently ended their relationship sometime at the end of 2018 or the
beginning of 2019.  Neither "E. Unknown" nor M.J. has filed an appeal from
the termination order or is a party to this appeal.

outside of a home, and left [Child] with a friend. She couldn't remember who she left [C]hild with. Eventually, [Child] was located by police. [C]hild was found alone in the apartment by himself. [Child] was brought into care of CYF on August 7, 2017, and adjudicated dependent on October 18, 2017.

Trial Ct. Op., 4/14/20, 2-3.

By way of further background, the record shows that in February of 2015, Dr. Neil Rosenblum, a clinical psychologist with Allegheny Forensic Associates (AFA), initially evaluated Mother in connection with the CYF case involving Mother's older child.[2] Evaluation, 2/5/15, at 1. In his report, Dr. Rosenblum noted that Mother stated she had been in mental health treatment "all [her] life" for anxiety and depression. Id. at 5. Mother also acknowledged a pattern of past visual and auditory hallucinations. Id. According to Dr. Rosenblum, Mother presented with pronounced mood swings, a short attention span, and a high degree of impulsivity. Id. Dr. Rosenblum rated Mother's judgment and insight as poor. Id. At that time, Dr. Rosenblum concluded that Mother's emotional volatility and unstable mental health status made it impossible for her to provide a stable home life for her older child. Id. at 7. As noted above, Mother's parental rights to her older child were subsequently terminated in 2015.

---

[2] Written reports of Dr. Rosenblum's evaluations were admitted at the termination of parental rights (TPR) hearing as CYF Exhibit 3. N.T., 2/7/20, at 75. Additionally, CYF admitted the trial court's prior orders as CYF Exhibit 1 and the FSP's as CYF Exhibit 2.

In the instant case, following Child's removal from Mother's care and adjudication of dependency, CYF developed an initial FSP in November of 2017. The initial FSP identified Mother's needs as (1) providing a more comfortable living environment for Child,[3] (2) addressing mental health concerns, and (3) learning child development skills. As to the mental health concerns, Mother was to meet every Monday at Pittsburgh Mercy to complete dual diagnosis therapy.

The FSP for December of 2017 added a goal for Mother to complete an "AFA Evaluation to discuss [mental health] concerns." FSP, 12/22/17, at 5. Mother's visitation at that time consisted of two-hour long supervised visits two days per week.

Dr. Rosenblum evaluated Mother on February 1, 2018, in connection with the present case.[4] At that time, Dr. Rosenblum conducted an individual

_____

[3] In the instant termination of parental rights (TPR) petition, CYF indicated that after finding Child alone at the home of Mother's friend, "[p]olice also went to [M]other's home, at which time it was found that [M]other had no furniture except an air mattress." See TPR Pet., 6/6/19, at ¶ 8.

[4] In the reasons for referral section of his February 2018 report, Dr. Rosenblum stated:

> [Child] is currently being referred for an interactional evaluation with [Mother], with [M]other also scheduled for an individual mental health assessment. Specific referral questions include: 1) does [M]other have a current mental health diagnosis and if so what services would be needed to assist [M]other, 2) does [M]other have a bond with [Child] and is she appropriate with affection with him, 3) does [M]other continue to internalize [Child's] needs and wants, and if so, what parenting service would

evaluation of Mother and an interactional evaluation with Mother and Child. Report, 2/7/18 at 1. In his report dated February 7, 2018, Dr. Rosenblum stated that Mother presented with similar symptoms as she had in his prior evaluation. Id. at 3. Dr. Rosenblum observed that Mother wanted to present herself in a positive light but exhibited "a high level of cognitive confusion" and rapidly changing emotions. Id. at 4. Dr. Rosenblum described Mother's responses to testing as "highly unrealistic," and indicated that her "test results [were] very much lacking in validity." Id. For example, the doctor noted that "[Mother] failed to endorse a single feature dealing with mood swings, affective instability, racing thoughts, or symptoms of hypomania, despite exhibiting significant clinical evidence of such concerns. . . ." Id. Dr. Rosenblum rated Mother's judgment and insight as poor. Id. at 3.

Dr. Rosenblum concluded that Mother struggled with mental health issues but was "well aware of the fact that acknowledging such concerns would adversely affect her ability to have [Child] return to her care." Id. at 6. Dr. Rosenblum noted that Mother acknowledged "significant mental health concerns" during her 2015 evaluation but denied all such concerns during the February of 2018 evaluation. Id. at 4. Dr. Rosenblum suggested that Mother

_____

be indicated, and 4) does [M]other understand [Child]'s developmental needs.

Report, 2/7/18, at 1.

would benefit from appropriate psychotropic medication and "more intensive group therapies." Id.

Between March and July of 2018, Mother's visits were first increased to four days per week, with two of those visits being coached and two being unsupervised, and then to five-hour unsupervised visits, twice per week. CYF, however, in either the FSPs for March and July of 2018, did not add requirements that Mother seek medication for her mental health issues or seek more intensive therapies.

On October 31, 2018, Dr. Rosenblum conducted a third evaluation of Mother, as well as another interactional evaluation of Mother and Child, and he issued a report on November 12, 2018. Report, 11/12/18, at 1. In his report, Rosenblum again observed that Mother's attention span was short, "jumping from one association to another." Id. at 4. During her interactions with Child, Mother would lose focus on Child and the activity at hand. Further, Mother would become frustrated with Child for displaying age-appropriate behavior. According to Dr. Rosenblum's report, Mother's "responses to psychological testing were highly distorted and largely lacking in validity." Id. at 5. Dr. Rosenblum also noted that Mother indicated that she is an "incredible mom." Id. at 6.

Dr. Rosenblum observed that there was "very little change in [Mother's] mental health and functioning" as she continued to exhibit limited attention span, hypomania, and a heightened degree of instability. Id. at 6. Dr.

Rosenblum noted that "[Mother] [wa]s not on any psychotropic medication and d[id]n't believe that she needs it." Id.

In the conclusion section of his November of 2018 report, Dr. Rosenblum "strongly" recommended that Mother follow through with a psychiatric consultation and begin a trial on medication to "reduce her cognitive confusion, help her improve emotional regulation . . ., and improve her concentration and ability to sustain her focus on productive activities." Id. He continued, "[w]ithout more well-defined and constructive mental health intervention it is not going to be possible for [Mother] to reliably improve in her parenting skills or ability to function effectively in providing care for [Child]." Id. at 7.

In the FSP for December of 2018, CYF indicated that Child remained in foster care due to Mother's lack of compliance with CYF. CYF added "medication management" under Mother's mental health goals. FSP, 12/10/18, at 3. Mother's visits remained twice a week for five hours, unsupervised. The FSP maintained a goal of reunification but changed the concurrent goal from placement with a family member to adoption.

On January 8, 2019, the trial court entered an order directing that "[v]isits for [M]other are to be supervised." Order, 1/8/19. The order

continued: "Mother is permitted to have some unsupervised time during the visits. [M.J.] is not to be present during [Mother's] visits."[5]

The FSP for February of 2019 indicated that Mother "had a psychiatric evaluation at Mercy." FSP, 2/13/19, at 2. Under "action steps," the February of 2019 FSP required Mother to "follow any and all recommendations when the evaluation is received."[6] Id. The FSP also called for Mother to continue attending once weekly outpatient dual diagnosis treatment at Mercy to work on coping strategies and "to identify red flags that lead her into violent relationships." Id.

On June 6, 2019, CYF filed a termination of parental rights petition. The petition alleged, in part:

> [Mother] is currently unable to parent this child as she has failed to comply with the goals established for her in [FSP's] and ordered by th[e trial court]. Mother has not participated in or completed drug and alcohol treatment.[7] Mother participates in weekly mental health treatment; however, her level of cooperation and progress is unknown. Mother has not participated in or completed intimate partner violence counseling. Mother visits with [Child]; however, her visits were recently changed from unsupervised to supervised after it was learned that [Mother] was out in the

_____

[5] The trial court titled the order as an order upon a motion of a party. The motion is not contained in the record. However, it appears that the trial court ordered visitations to be supervised following an incident involving M.J., Mother's paramour at the time. See N.T. at 42 (indicating that Mother's visitations went back to supervised after "the incident with M.J.").

[6] CYF did offer any reports from Mercy Behavioral Health into evidence.

[7] We note that CYF did not substantiate the allegation that Mother was not participating in drug and alcohol treatment. See Trial Ct. Op. at 5 (noting that "drug and alcohol is no longer a concern for Mother").

community with [Child]. There are additional concerns that [Mother] continues to have contact with her paramour, with whom there are concerns of intimate partner violence.

Pet. at ¶ 9.

After the filing of the TPR petition, Dr. Rosenblum evaluated Mother for a fourth time in October of 2019 and issued a report on November 16, 2019. Dr. Rosenblum conducted an individual evaluation of Mother, an interactional evaluation of Mother and Child, as well as an interactional evaluation of Foster Mother and Child. Id. at 1.

Dr. Rosenblum noted that Mother reported that she started taking a psychotropic medication, Wellbutrin, at that time. Report. 11/16/19 at 5. However, Mother continued to display a pattern of emotional lability despite Mother's report that she started taking prescription medication. Id. at 1. During the evaluation, Rosenblum observed that Mother "is desirous of portraying herself in excessively positive terms as functioning extremely well in her personal adjustment." Id. at 5. However, Dr. Rosenblum noted that "[Mother] continues to display racing thoughts and rapid speech, with continued symptoms of hypomania and a tendency to jump from one association to another very quickly." Id. at 4.

Dr. Rosenblum concluded:

In my clinical opinion [Mother's] mental health status remains marginal, unpredictable, and not consistent with someone who can be reliably depended upon to use sound judgment. Her ability to respond to the needs of [Child] in an effective and protective manner is also very questionable. As a result, it is this evaluator's clinical opinion that a goal change to adoption is consistent with [Child's] needs and welfare at this time.

Id. at 7.

The trial court held the TPR hearing on February 7, 2020.[8]  At the hearing, CYF presented testimony and evidence through Michele Williams, a CYF caseworker, and Dr. Rosenblum.  Mother testified on her own behalf.

The trial court summarized the testimony at the hearing as follows:

Ms. Williams testified that Mother had prior history with the agency; she had an older daughter who [Mother]'s rights were involuntarily terminated, and that child had since been adopted.

\*    \*    \*

Ms. Williams testified that Mother was ordered to drug and alcohol treatment.  When questioned about [Mother]'s progress on her drug and alcohol treatment goal, Ms. Williams responded: "[Mother] was — she I have an assessment with POWER.  That was completed on 9-28-17.  However, she was recommended to just complete outpatient mental health therapy services."  No further treatment for drug and alcohol treatment was recommended.  As such, drug and alcohol is no longer a concern for Mother.

Ms. Williams also testified to Mother's parenting goal.  Ms. Williams testified that Mother had this goal because "there were concerns about her care of [Child], that she left him alone and did not ensure his safety by making sure that someone was with him."  Ms. Williams also testified that [Mother] completed parenting by participating in the Holy Family coached visitation.  Mother started

_____

[8] Prior to the TPR hearing, Frank McWilson, Esq. (GAL) entered his appearance on behalf of Child.  Mother has not challenged Child's right to legal counsel. See In re Adoption of K.M.G., 219 A.3d 662 (Pa. Super. 2019) (en banc) (appeal granted) (holding that (1) "this Court's authority is limited to raising sua sponte the issue of whether the orphan's court violated Section 2313(a) by failing to appoint any counsel for the Child in a termination hearing," and (2) we may not "review sua sponte whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding" (citations omitted) (emphasis in original)).

her coached visitation in January 2018 and completed the program in June 2018. Mother also has a Family Service caseworker who also addressed parenting goal when they were meeting with [Mother].

Ms. Williams testified that [Mother] consistently maintained her visitation goal. She testified, "[Mother] does have visitation. Part of those visitations are supervised, so she has not had any unsupervised day visits or any type of overnight visits for [CYF] to be able to determine her parenting." Mother's visits are usually a few hours, partially supervised, and partially unsupervised. The caseworker would bring [Child] to [Mother], spend some time with them and then leave Mother and [Child] for about an hour and half, to two hours alone. The caseworker would then return to pick up [Child] and transport him back to his foster home. Throughout the life of the case, Mother has consistently maintained her visits with [Child].

Ms. Williams testified that Mother had a domestic violence objective because she was involved in an incident with her paramour. When questioned if [Mother] completed domestic violence treatment, Ms. Williams testified, "Not to [CYF's] knowledge, no. She was referred for [intimate partner violence] and domestic violence on October — I'm sorry, December 2018, but she did not participate or there's been no record that she has participated in that." There was no documentation that [Mother] attended nor successfully completed her domestic violence goal.

Mother's main goal has been mental health throughout the life of the case. Ms. Williams testified, "[Mother] has a history of mental health dating back to when she was a child. There are concerns about her behavior and the stability of her mental health." Ms. Williams testified that the only diagnoses that [CYF] had were from evaluations that were complete by Dr. Rosenblum. She further testified, "[Mother] continu[ed] to receive services at Mercy Behavioral Health. She was recommended to do—take medication. She reported that she started taking medication in October of 2019." The [trial c]ourt later learned through Ms. Williams['] testimony, that [Mother] had received the recommendation to take medication for her mental health in November of 2018. There was documentation that [Mother] had been working with Mercy Behavioral Health from November 2017[] until June of 2019. Nonetheless, Ms. Williams expressed ongoing concerns regarding [Mother's] mental health. She testified: "We would want to see that [Mother] have more

consistently attending in order to ensure that her mental health is stable, that she's taking her medication as she needs to in order for her to have stability so that she can take care of [Child] and ensure his safety." She also testified, "[Mother] called me yesterday and was very verbally loud and aggressive toward me on the phone. She's not done that in the past before, so I'm not sure what was the reason why yesterday." Ms. Williams further testified:

> Even though [Mother] has made progress on her goals, [CYF] still is concerned regarding her stability of her mental health. Will she be able to maintain that stability, It's still unknown. [Child] has had supervised visits with [Mother], but she has not had him in her care over an extended period of time. Also, [Child] has now almost been in the foster home with [foster mother] for almost two years. [CYF] would want to have permanency for [Child], and with [Child]'s mental health history and then just the uncertainty, we'd like to move forward with having a permanent home for [Child].

Mother's inability to stabilize her mental health was the primary reason CYF moved forward with TPR petitions, seeking termination of [M]other's parental rights, and seeking permanency for [Child].

\*     \*     \*

At the TPR [h]earing, the [c]ourt heard reliable testimony from [Dr. Rosenblum]; whom was qualified as an expert and informed in child psychology. Dr. Rosenblum had completed four evaluations and reports for this family: February 5, 2015, February 7, 2018, November 12, 2018 and November 16, 2019. Dr. Rosenblum discussed his initial individual evaluation of [Mother] in February of 2015. He testified:

> "[Mother] has always had a history of prominent mental concerns. At the time of that evaluation of 2015, I diagnosed her with schizoaffective disorder, a rule-out of post-traumatic stress disorder, a history of cannabis abuse an impulse control disorder with paranoid personality traits and a rule-out of borderline intellectual function.

> She has always had a history of some concerns with hallucinations and, you know, paranoid delusional thoughts, episodes of bipolar disorder, rapid mood swings and

- 11 -

difficulty maintain focus on her thoughts and regulating her emotions effectively.

She's had a history of conflict with other people and has [undergone] psychiatric treatment for many years without any, at the time of this evaluation and others, any appreciable change of significant nature on her part.

Dr. Rosenblum stressed that it was his understanding that [Mother] has always had mental health concerns since she was a child.

When questioned about changes between [M]other's original evaluation in February of 2015 and her most recent evaluation in November of 2019, Dr. Rosenblum testified:

I would say that she presents or minimizes her mental health functions, and I would say that there doesn't appear to be as much evidence of hallucinations or delusions, but I believe that she is well aware of the fact that the concerns has raised about her mental health functioning as a major obstacle to her ability to parent her son . . . so, she talks about these symptoms now more like dreams or dreamlike states that she has during the day when she thinks about her mother or if she recognizes that her may be near her.

I would say that there may be mild improvement in her mental health functioning, but at the same time, I would say that there's still evidence of clear bipolar disorder[], problems with questions about the likelihood of hallucinations as well.

Dr. Rosenblum believed that although [M]other spoke as [though] she had improved slightly, he still had major concerns about her efforts to minimize her mental health needs. He further testified, "I do not believe that she achieved the stability in her mental health functioning that she's capable of making sound decisions or providing appropriate care for her son."

Dr. Rosenblum additional[ly] testified, "I don't see a significant, perhaps mild but not significant level of improvement[."] He further explained on cross examination, "I think [M]other has made efforts to try to understand some of her mental health symptoms and control them . . . she'll try to avoid dealing with situations that stress her out. So, I would say that she's trying to avoid conflict and trying to avoid negative influences and stress

factors in her life perhaps better than she has in the past." Over a four-year period of evaluating [M]other, Dr. Rosenblum expressed although he acknowledges some growth, yet still, he had concerns regarding Mother's mental health and her ability to properly care for [Child].

\* \* \*

Mother testified that she goes to outpatient mental health therapy weekly at Mercy Behavioral. She testified that she and [M.J.] got into a slight altercation but no police were called. "It was just a misunderstanding, that's what it was, and miscommunication between both of us. He went his way, I went my way, and then I proceeded on the visitation with my son." Mother did not think she needed domestic violence treatment. [Mother] also testified that she works full time and has housing. Mother testified that she has been taking her medication since October of 2019. She further [] explained, "It['s] been helping me have clearer thoughts, and it['s] been helping me have a stimulating mind and has been helping me to stay focused. [Mother] testified that she was ready to be a mother to her child and had the support of her sisters in raising [Child]. She testified that [Child] cries when the visits are over, and that neither of them want to leave each other. She also testified that she has good communication with [Child's] foster mother, her cousin. This [c]ourt has no doubt that mother loves and cares for [Child].

Trial Ct. Op. at 4-11, 12 (footnotes and record citations omitted) (emphasis added).

At the conclusion of the hearing, the trial court took the case under advisement. Id. at 108. The trial court filed the decree terminating Mother's parental rights on February 10, 2020. On March 10, 2020, Mother filed a timely notice of appeal and a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive opinion.

In its Rule 1925(a) opinion, the trial court found there was "clear and convincing evidence that termination was warranted under 23 Pa.C.S.[ §] 2511(a)(2), (a)(5), an[d] (a)(8)" and that "[t]ermination of Mother's parental rights would best serve the physical, emotional and psychological needs of welfare of [Child] pursuant to § 2511(b)." Trial Ct. Op. at 15. In support, the trial court summarized the testimony offered by Ms. Williams and Dr. Rosenblum and concluded:

> CYF presented credible testimonies that Mother suffers from ongoing difficulties with mental health treatment and has repeatedly been unable to demonstrate that she can provide Child with a safe environment due to her inability to stabilize her mental health. Ms. Williams and [D]r. Rosenblum, both testified that that [M]other has had mental health concerns since she was a child and her mental health directly affects her parenting abilities. All witnesses testified that Mother began taking her medication in October 2019, although it was recommended for her to take medication for her mental health in November of 2018.[9] Dr. Rosenblum testified that although Mother has made mild improvements, she minimizes her mental health needs and acts as though there are no issues with her parenting which is a major concern for him. Mother[] has met some of goals, but the primary issue that brought [Child] into care, [M]other's mental health, remains an issue three years later.[10]

_____

[9] The trial court "did not consider her taking her medication as compliance for her [m]ental [h]ealth [g]oal" because the Mother began taking her medications after CYF filed the TRP petition. Trial Ct. Op. at 6 n.5.

[10] We note that the trial court refers to several different time frames as testified to by the parties. See Trial Ct. Op. at 7 (noting the testimony that Child was in his foster home for almost two years), 10 (noting the "four-year period" Dr. Rosenblum evaluated Mother), 11 (noting Dr. Rosenblum's testimony that Child's psychological needs were not connected for at least three years), 16 (finding that Mother's mental health remained an issue

Id. at 15-16 (emphasis added).

Mother raises a single issue for our review:

Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

Mother's Brief at 6.

## Section 2511(a)

Mother argues that CYF failed to present clear and convincing evidence to support the trial court's determination under Section 2511(a). Specifically, Mother contends that the record did not establish that the conditions that led to Child's removal still existed and could not be remedied or that termination would best serve Child's needs and welfare. Id. at 22. Mother emphasizes that the record "include[d] evidence that Mother exhibited parenting skills and made progress to a point where Mother could provide proper care and control of Child." Id. at 28

In support, Mother references the lack of unsupervised day visits or overnight visits and asserts that "CYF's inability to assess Mother's parenting capacity does not equate with proof that Mother cannot parent." Id. at 22-23. Mother maintains that CYF did not offer evidence supporting its concern

---

"three years later"). As noted above, approximately twenty-two months passed between Child's removal from Mother's care and CYF's filing to the TPR petition, and thirty months passed between Child's removal and the TPR hearing.

for domestic violence or that Mother failed to participate in a domestic violence program. Id. at 23

As to CYF's concerns regarding Mother's mental health, Mother argues that "CYF's uncertainty is not proof Mother could not maintain mental health stability." Id. Mother asserts that CYF was not able to provide competent evidence to support the concern that she was not taking her medication. Id. Further, Mother points out that CYF was unaware that Mother rescheduled any missed therapy appointments and "received no reported concerns from Mother's therapist." Id. at 23-24.

Mother further asserts that it was an abuse of discretion for the trial court not to consider her use of medication because there is no evidence that it was prescribed or recommended by her therapist prior to October of 2019. Id. at 24. Mother also contends that the trial court improperly relied on Dr. Rosenblum's recommendation that Mother take medication for mental health because he is not a psychiatrist and there is no indication that Mother's psychiatrist recommended medication prior to October of 2019. Id. at 25. Mother emphasizes that "[FSP's] developed by CYF never indicated Mother should increase her level of treatment to intensive outpatient therapy or to be evaluated for mental health medication. Id.

Mother contends that the trial court abused its discretion by finding the testimony of Ms. Williams and Dr. Rosenblum that Mother had mental health concerns since she was a child credible. Id. at 27. Mother asserts CYF failed to admit any records that she had mental health issues before Dr. Rosenblum

evaluated her in 2015. Id. Mother posits that "Dr. Rosenblum relied only upon Mother's statement that she had been in therapy all her life." Id. Mother further argues that the trial court erred by crediting testimony that she attempted to downplay her mental health symptoms when meeting with Dr. Rosenblum. Id. at 26. Mother asserts that her "credibility is a determination for the [trial] court and [it should not have relied on] Dr. Rosenblum's belief that Mother was not credible." Id.

CYF counters that "the trial court did not abuse its discretion and/or err as a matter of law in granting CYF's petition to terminate Mother's parental rights." Appellee's Brief at 11. CYF contends that Mother has struggled with mental health concerns since childhood and been unable to stabilize herself in a position to care for Child. Id. at 16. CYF maintains that "Mother does not show the stability and sound capability of judgment that would allow her to parent a child." Id. at 17. While Child is familiar with Mother, CYF argues that terminating Mother's parental rights will not harm Child because "he does not rely on Mother to meet any of his needs." Id. Accordingly, CYF posits that the trial court properly entered a decree terminating Mother's parental rights. Id. at 18.

The GAL argues that the trial court "heard and properly weighed evidence regarding ongoing parental incapacity and needs and welfare standards from [CYF] caseworker, Michelle Williams and psychologist, Dr. Neil Rosenblum." GAL's Brief at 17. Significantly, the GAL maintains that Mother's mental health concerns remain "largely untreated or undertreated." Id. at

20. The GAL asserts that "[h]er condition is well known to the trial court and properly addressed by [Ms. Williams and Dr. Rosenblum]." Id.

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

> As we discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" Id. (citation omitted).

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8). This Court "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." In re M.T., 101 A.3d 1163, 1179 (Pa. Super. 2014) (en banc) (citation omitted). The parties here focus on the trial court's finding that Mother had mental health issues that led to the removal and placement of Child and continued to exist. See Trial Ct. Op. at 15-16. While

neither the parties nor the trial court expressly frame their analyses in terms of any subsection or element of Section 2511(a), we review the trial court's decision under Section 2511(a)(8). See M.T., 101 A.3d at 1179.

Section 2511(a)(8) provides:

§ 2511. Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*      \*      \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

In order to terminate parental rights under this subsection,

an agency must prove by clear and convincing evidence that "(1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child."

In re C.L.G., 956 A.2d 999, 1005 (Pa. Super. 2008) (en banc). When considering Section 2511(a)(8), "the court shall not consider any efforts by the parent to remedy the conditions . . . which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

With regard to the first and second requirements under Section 2511(a)(8), the trial court's decision to terminate a parent's rights "does not require an evaluation of [the parent's] willingness or ability to remedy the conditions that led to placement of the children." In re R.J.S., 901 A.2d 502, 511 (Pa. Super. 2006). Instead, subsection (a)(8) "requires only that the conditions continue to exist" after the twelve-month period beginning with a child's removal has elapsed. I.J., 972 A.2d at 9. This Court has recognized that "by allowing for termination when the conditions that led to removal continue to exist after a year, [subsection (a)(8)] implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities." Id. at 11–12 (quoting In re C.L.G., 956 A.2d at 1005).

As to the third factor under subsection (a)(8), "while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' [a court is] required to resolve the analysis relative to Section 2511(a)(8)" before addressing Section 2511(b). C.L.G., 956 A.2d at 1009. "The analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent." In re C.B., 230 A.3d 341, 349 (Pa. Super. 2020) (citation omitted), appeal denied, 234 A.3d 410 (Pa. 2020).

Instantly, as to the requirement that Child be removed from Mother's care for twelve months, the record establishes that Child came into CYF's care on August 7, 2017, based on a protective order issued when Mother could not remember with whom she left Child and police found Child was left alone. See

N.T. at 7, 19-20; see also TPR Pet., 6/6/19, at ¶ 8. CYF filed the instant TPR petition on June 6, 2019, nearly two years after Child's removal from Mother. See N.T., at 44. Accordingly, CFY established the first requirement of Section 2511(a)(8). See CLG, 956 A.2d at 1005.

As to the second factor, the trial court found that Mother's mental health was "the primary issue that brought [Child] into care" and remained an issue. Trial Ct. Op. at 16. In reaching this decision, the trial court credited Ms. Williams' and Dr. Rosenblum's testimony that Mother continued to struggle with mental health challenges over the life of the case and did not begin taking her medication until October of 2019, after CYF filed the TPR petition. Id. at 15-16.

Our review of the record establishes the following. Dr. Rosenblum testified that he conducted four individual evaluations of Mother between 2015 and 2019. See N.T. at 47-51. Significantly, both Ms. Williams and Dr. Rosenblum testified to their understanding that Mother had mental health concerns based on CYF's prior involvements with Mother. See id. at 13, 48. Both testified that they had ongoing concerns that Mother's mental health issues. See id. at 18-19, 48-49.

Further, the trial court noted that Dr. Rosenblum testified that Mother has displayed mild improvement since he the first time he saw Mother. See id. at 49. Nevertheless, but he remained concerned about evidence of untreated bipolar disorder and possible hallucinations. See id. at 49. Dr. Rosenblum stated that Mother's minimization of her symptoms suggests that

she does not recognize when she is experiencing difficulty coping with stress or agitation. Id. at 65. Accordingly, Mother fails recognize "what she needs to do in order to keep her mental health balanced and functioning effectively." Id.

Dr. Rosenblum also conducted three interactional evaluations of Mother and Child. Dr. Rosenblum testified that Mother tries to remain engaged when she is with Child but has difficulty with structure and promoting education. N.T. at 65. Dr. Rosenblum further opined that "Mother struggles to maintain stability in her own life and would certainly have difficulty doing the same for Child." Id. at 66.

Additionally, when asked by CYF's counsel whether Mother would be able to care for Child full time in her current state, Dr. Rosenblum responded:

> I do not believe that [Mother] achieved the stability in her mental health functioning that she's capable of making sound decisions or providing appropriate care for [Child]. . . .
>
> *   *   *
>
> My concern is that [Mother's] decision-making [is] impaired by her mental health functioning, that she doesn't recognize [Child's] emotional needs. There have been concerns about domestic violence and unstable relationships with other people, and I just don't believe that she shows the stability and the sound capability of judgment that would allow her to parent a child.

Id. at 49-50; see also Report, 11/16/19, at 7 (concluding that Mother's "mental health status remains marginal, unpredictable, and not consistent with someone who can be reliably depended upon to use sound judgment").

Accordingly, the record supported the trial court's finding that Mother's mental health was "the primary issue that brought [Child] into care" and remained an issue. Moreover, we discern no basis to disturb the trial court's ultimate conclusion that CYF presented clear and convincing evidence establishing that the second factor of subsection (a)(8)—that the conditions that led to Child's removal continue to exist after more than twelve months from Child's removal. See I.J., 972 A.2d at 9.

As to the third element of subsection (a)(8)—i.e., that termination would best serve the needs and welfare of Child—the trial court concluded that Mother had "repeatedly been unable to demonstrate that she can prove Child with a safe environment." Trial Ct. Op. at 15. As stated above, the trial court heard and credited testimony that Mother's ongoing mental health issues remained a barrier to proceeding with further unsupervised visitations and ultimately reunification. See N.T. at 18-19, 49-50. Additionally, Dr. Rosenblum, when evaluating Mother, also had opportunities to observe Mother's interactions with Child. See id. at 66, 68; Report, 2/7/18, at 1-2; Report 11/12/18, at 1-3; Report, 11/16/19, at 2-4. As Dr. Rosenblum noted:

> I think [Mother] tries with [Child]. Again, I know that she adores him and can be playful with him at times, but there are other times when she's not focused on what he's doing. She does have difficulty with structure and promoting learning, and in my opinion, she has difficulty keeping her own life stable consistently, and I think that she would have -- I know that she would have difficulty doing the same for [Child].

\* \* \*

. . . I have seen that [Mother] doesn't fully recognize what behaviors are age-appropriate for [Child], and sometimes, you know, therefore doesn't respond to him effectively . . . .

N.T. at 65-66. Accordingly, the record supported the trial court's findings of fact and the court's legal conclusion that CYF provided sufficient evidence that the termination of Mother's parental rights would best serve the needs and welfare of the Child as required by the third requirement of subsection (a)(8). See C.B., 230 A.3d at 349.

We acknowledge the challenge of the instant case in determining whether Mother's mental health issues have prevented her from providing appropriate parental care for Child, and we are sympathetic to Mother's ongoing struggle with these concerns. Indeed, as Mother notes, she complied with a drug and alcohol assessment and the recommendations for weekly outpatient mental health therapy. Moreover, the trial court consistently found her to be at least in moderate compliance with her FSP goal, including her mental health goals. Lastly, as noted by Mother, the trial court did not enter an order requiring her to take psychiatric medications, nor did CYF implement a FSP requirement that she attend more structured mental health programs.

Nevertheless, Dr. Rosenblum remained steadfast in his expert opinion that Mother's mental health issues impeded her ability to provide appropriate care for Child and that the mental health issues continued to exist.[11] Those

_____

[11] We note that Mother stipulated to Dr. Rosenblum's qualifications at the TPR hearing. Moreover, while Mother advances several arguments that the trial

conditions existed for more than two years after Child's removal from Mother's care. As this Court has stated,

> the application of Section [2511](a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. . . . However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

R.J.S., 901 A.2d at 513 (emphasis in original).

In sum, having reviewed the record, the trial court's opinion, and Mother's arguments in this appeal, we conclude that the trial court's factual findings were supported by the record and that the trial court did not err in determining that CYF presented clear and convincing evidence for terminating Mother's parental right under Section 2511(a)(8). Accordingly, we are constrained to conclude that Mother's arguments do not merit relief. See S.P., 47 A.3d at 826-27.

### Section 2511(b)

---

court erred in its consideration of Dr. Rosenblum's testimony, those arguments go to the weight and credibility of his opinion regarding Mother's mental health state and her abilities to interact with Child. Further, Mother did not call her own medical expert witness or present testimony to rebut Dr. Rosenblum's conclusions.

Mother does not challenge the trial court's analysis of Section 2511(b) in her brief. While we could find this issue waived for failure to present an argument or cite legal authority, we will address the issue of the Child's best interests. See C.L.G., 956 A.2d at 1009 (addressing the best interests of the child under Section 2511(b) sua sponte). But see In re M.Z.T.M.W., 163 A.3d 462, 466 & n.3 (Pa. Super. 2017).

Section 2511(b) provides:

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

The focus in terminating parental rights under Section 2511(a) is on the parent, but the focus under Section 2511(b) turns to the child. See C.L.G., 956 A.2d at 1008. Our Supreme Court has stated:

The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In In re E.M., [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

> Instantly, the trial court noted:

> Case-worker, Ms. Williams and psychological expert, Dr. Rosenblum both testified that [Child] is bonded with his foster mother and severance of the bond would not cause serious harm to [Child]. This [c]ourt found severance of the relationship between Mother and Child was in the best interest of [Child]. [Child] is with [Mother's] relative, who has shared her desired to allow [Mother] and [Child] to maintain a relationship. Nonetheless, this [c]ourt believes it is [in Child's] best interest that he is provided permanency and that [Mother's] parental rights be terminated.

Trial Ct. Op. at 16.

As noted above, there was sufficient evidence that Mother's mental health issues impeded her ability to provide appropriate care for Child. Moreover, the record supports the trial court's findings that Child had a bond with foster mother and that while a bond existed between Mother and Child, severing that bond would be in Child's best interests. See N.T. at 17-19 (indicating Ms. Williams' testimony regarding Child's need for permanency). Moreover, as discussed by the trial court, Dr. Rosenblum opined that "Child's relationship with [Mother] is not based on a secure attachment and . . .that [Child's attachment] is, at this point in time, is more securely connected to his foster mother." See id. at 52. Dr. Rosenblum continued that Child did "not rely on [Mother] to meet his developmental, psychological or emotional needs" and concluded that Child would not suffer psychological harm from the termination of Mother's parental rights. See id. at 52-53. Accordingly, we

find no error or abuse of discretion in the trial court's conclusion that CYF presented clear and convincing evidence satisfying Section 2511(b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2020